petition that some Houston citizens presented to the City of Houston. Although it was valid, it was wrongfully denied. A court battle ensued, three different lawsuits, and ultimately my clients prevailed in the state court system. The election occurred and the ordinance that people objected to was thrown out by a vote of 69% to 31%. The law, the ordinance that was a subject of the referendum has an acronym, it's called HERO, which stands for Houston Equal Rights Ordinance. My clients who are pastors related to 400 churches had a problem with it because it could be interpreted to allow men, biological males, into women's restrooms, and that was the... This is an addendum to help me out, at least, on the standing questions that were raised with respect to some or many of the plaintiffs, i.e., the referendum, as I understand, was in the City of Houston, and some of them may have lived in Harris County, but not in Houston, etc. Some of this was addressed, some not, but obviously that's a threshold question, so you may have a quick answer, but... Let me jump right to standing, Your Honor. All right. I'm going to do it by person. Let's start with F. N. Williams. Pastor Williams has standing for the following reasons. Number one, registered voter. Number two, he signed the referendum petition. Number three, he helped organize the movement to get the petition circulated and signed and ultimately on the ballot, so he's a petition organizer. Number four, he's an actual signature on the document, not just as a petition signer, but it's called a circulator. Under Texas law, not only can you sign the petition if you live in the City of Houston and you're a registered voter and want this on the ballot, but you can also get other people to sign, and if you do that, you have to sign the document under oath, saying that you personally were in the presence of those who signed it, etc., and Pastor Williams did that. He signed not only as a petitioner, but as a circulator. And staying with Pastor Williams for a quick moment, Your Honor, he made it through three state court battles without his standing ever being thrown out. We filed two mandamus petitions. The first was to force the mayor to comply with her ministerial obligations when a referendum petition has been validated by a city secretary, and I'll go into that in a minute, and that went all the way to the Supreme Court, unanimous verdict, victory in our favor. We also had a second mandamus, where after we forced the mayor to put this on the ballot, she flipped the ballot language and turned the effect of a yes vote into a no, and a no vote into yes, so we sued her a second time, got another unanimous Supreme Court victory. Pastor Williams was my client there, and his had standing. Well, again, on the standing, so that's a good segue, because given that Williams won in state court, where is the redressability here in federal court? Sure. What the case law says is that although you don't have, in the first instance, a constitutionally protected federal right to initiative a referendum, if the state chooses to give it to the citizens, then it has to be protected constitutionally, and so because the city of Houston and its charter gives a referendum power to the citizens, we had that power, where the redressability comes in is that we should have never had to have filed any of the three lawsuits because there was a ministerial obligation to comply with the referendum petition. Let's accept all that is true for purposes of argument, but there has to be redressability now in federal court. Pastor Williams or perhaps the others have to be able to achieve redress in federal court now, and I don't see how that can lie, given all of the things that have happened. Subpoenas have been withdrawn, you won in state court, all of that's over. The answer to your question is money. For Pastor Williams in particular, it's probably only nominal damages, which were pled for in the case below, because he didn't personally come out of pocket. He spent a lot of time, energy, and talent, but he didn't actually spend money, so he would be entitled to nominal damages. On the others, I'll answer you there. This will cover standing and redressability in one. We've got Hernan Castano, Magda Hermida, and Conwin. Those three pastors were never litigants, but they were petition organizers, they did receive and register to vote, and they received these subpoenas, which I haven't mentioned yet, but there were subpoenas issued by the city of Houston asking for all of the sermons of these three innocent bystanders, and they were not even in litigation. Again, Your Honor, Justice Smith, I think those are going to be nominal damages for them, but the big core damage would be the Houston Area Pastors Council, HAPC. They also were a petition organizer. They're a non-profit corporation, and they managed the entire petition, so they're petitioners just like the other four. Now, the organization can't vote, so the assertion they're making here is that their right to petition for perceived redress of grievances under the federal constitution was violated, and they funded everything. All of the petition drives, all of the activities, all of the litigation, absolutely everything. And so that's really where the redressability and the money part comes in, Judge Smith, is the others are probably nominal damages, but HAPC would be significant damages. Quickly, I want to talk about what those 1983- You would say that you would, if we were to agree with you, I'm not at all suggesting we will or we won't, but if we were, that you would go back to Judge Gilmour with a request for nominal damages and attorney's fees, is that right? Nominal damages and attorney's fees for the four individuals, but compensatory actual damages and attorney's fees for HAPC, which is a much larger number, yes, and here's why. Under 1983, you can get damages and fees, of course, fees under 1988. There were five violations of 1983 here, Your Honor. First, the denial of the referendum petition. The Texas Supreme Court has already settled that. They said that when Anna Russell, the city's secretary, certified there were a sufficient number of signatures on the petition, then it's ministerial from that point forward. You have to do three things. The first thing you have to do is accept the petition as valid, and they didn't do that. The second thing they didn't do is they didn't reconsider whether Hero should be repealed at the political level, that is, the Houston City Council level. That is required under the Houston City Charter when you have a valid referendum petition, and they didn't do that. Third, they refused to call the election. What the charter requires ministerially is that, look, the ordinance is immediately suspended. If you want to repeal it in its entirety, you can, but if you don't, then you've got to put it on the ballot. The mayor wouldn't allow it to go on the ballot, so that's the third violation. But that was decided. You pursued that successfully in state court. Absolutely, absolutely. How can you come into federal court to get damages for that same violation? Well, it's the answer that I gave previously. What Meyer and Buckley cases cited in our brief stand for is that the right to petition government for redress is a core protected First Amendment right, and that right was violated here, and we should have never had to have forced the mayor to do what her ministerial obligations were. And so for the four individuals, their rights were violated. But that's a right. Actually, I don't mean to interrupt your train of thought, but that federal right could have been litigated in state court. State courts are confident to entertain federal causes of action, so that could have been handled in state court. Here's why that's not correct. These are mandamus proceedings in state court. These aren't money damages claims in state court. What we were trying to do is ensure that this got on the ballot. It's a right to vote on the referendum itself. So we're not going to court and saying, give us money, we're upset. No, we're going to court to say, make the mayor put this on the ballot. But that was under state law that you pursued it. That's right. But you could also have said, put it on the ballot because it's a violation of federal law, federal constitution, but you didn't pursue that there. As part of the mandamus, that could have been brought. Respectively disagree, and here's why. The nut of or the core of what we were trying to accomplish, whether we were in federal court or in state court, was to get this on the ballot. That is a mandamus proceeding. It doesn't provide the collection of attorney's fees and it doesn't provide declaratory judgment attorney's fees. It's not allowed under state law. And trying to get fees in the case, we would be met with an immunity defense and were met with that defense in the state court proceedings because they're saying, look, we're immune from lawyer fees in a deck action that doesn't exist elsewise. And so for those reasons, Your Honor, we were trying to get this on the ballot, not try to get money. Now, the fourth and fifth DTPA, or excuse me, fourth and fifth 1983 violation that I didn't get to are number four, the subpoenas. So all of these three individuals got subpoenas for their sermons and for their text messages and for their voicemails and for their writings and anything that they had shared with their parishioners were unconstitutional. They were getting spanked, if you will, because they dared to challenge the mayor on this issue. And then lastly, the ballot language was flipped, which I mentioned quickly before. So all five of those reasons give rise to 1983 liability. What reason, if any, did Mayor Parker give for, as far as this record reflects, for issuing the subpoenas? I'm not asking you whether the reason was valid. I'm asking what reason was given. When she first did it, it's not really clear from the record if she knew that this was going to be done by her lawyers. But after it was done and we objected to it, she doubled down and ratified it. In the pleading and in this record, she said that when pastors engage in politics, their sermons are fair game. That's a quote, essentially. Also, her city attorney, David Feldman, had a press conference with the mayor standing next to him and said that when pastors are engaged in this type of activity, then we have a right to look to see what it is they're saying to their parishioners. That was their justification. That's absolutely violative of our freedom of religion, freedom of expression, freedom of association, right to vote, and the right to petition government. All of those rights were trampled by those unconstitutional subpoenas. Now, when we get to the question of immunity, and she tries to say, you know, I'm immune from all of this, immunity doesn't apply to a ministerial obligation. It's not a discretionary act here. She was forced because our city secretary, Anna Russell, said we have enough signatures on the petition to validate it. The mayor was forced then to do what the three things are required under the city charter. Number one, you've got to say immediately that this ordinance that's now been challenged is unenforceable right now, it's on ice, didn't do that. You've got to then reconsider it at the political level, didn't do that. And if you don't reconsider it and repeal it in its entirety at the political level, you've got to put it on the ballot, she didn't do that. All of those things are mandatory obligations, and she was clothed with state authority, stood up and said I'm just not going to do that, and therefore those are not actions for which she would be immune. Two more quick points as I'm about to run out of time. I wanted to make sure that when we get into this question of whether or not HAPC, the organization, can receive fees and expenses from earlier litigation, even my opponent in their briefs cite cases that support that very proposition. For example, North Carolina v. Crest Street, U.S. Supreme Court case in 1986, specifically said that if you file a 1983 case and before you file it you had administrative proceedings where you spent lawyer fees, you can get them, you can recover them. The hiccup in that case is that you can't just go in without filing a 1983 case. You've got to file the 1983 case, you've got to connect it to a violation under 1988, and then you can look backwards and collect past fees. What do you do with the Acorn v. Fowler case? I think that case helps me rather than hurts me, Your Honor, and here's why. First of all, it makes a general point that at the pleading stage, you indulge in presumptions that are favorable to our pleading, and they said there that litigation costs alone that aren't connected to the defendant's wrongful conduct are costs that are just self-inflicted injuries, and you can't get those. That's not this case. We didn't just gratuitously file these lawsuits. We had to file these lawsuits because of the defendant's wrongful actions. They wouldn't do their ministerial obligations, so we had to file. Second point why this case helps us, doesn't hurt us, even in the Acorn case, the panel here found that Acorn did have standing with respect to the funds they had to spend to counteract the wrongful conduct in not establishing and administering the motor vehicle laws, and so registration laws. And so that stands for the proposition that, yes, you can look back and collect damages for court costs that are incurred prior to. I see that my time is up. All right. Thank you, Mr. Taylor. You've served your rebuttal time. Ms. Elson. May it please the Court. There's one factual point I'd like to make clear just so that everything is in perspective. There were two pieces of litigation that counsel referenced, the two mandamus petitions. There was also state court litigation regarding the validity of the petition, the referendum petition itself, and that is in the pleadings, and that went to a jury in that case. And what's important about it is that there were jury questions asking about whether there were non-accidental defects, and also there were jury questions regarding fraudulent signatures on the petition. And that is important later when we discuss it. I'd like to discuss the reason that the subpoenas were issued to the pastors. So that in context. Why don't you do that now? Sure. What was Mr. Feldman's justification for it? The pastors were involved in, as has been admitted to the pleadings, the pastors were involved in organizing the petition drives. And in instruction, there were videos that came forward during the state court litigation where the pastors were giving instructions to the people that were going to go around and collect the petitions about what had to be done in the collection of the petitions. So what instructions they were giving, and the fact that it was the word sermons was in the discovery request, which it was a list of requests basically asking for where they were giving instructions about how to fill out the petition. So if it was in a sermon, it was in a sermon. That was later withdrawn, as you said. The whole subpoena to the pastors was later withdrawn. But in any case, the subpoenas were issued because it was relevant what instructions were being given to the people because one of the questions that were in the jury trial were whether there were non-accidental defects or what the individuals knew was relevant. You would acknowledge, would you not, that it was excessive to include the word sermon? I mean, that was the hot-button issue. That was the hot-button issue. And yet the mayor and the city attorney stuck with that for a good long time in saying that there was nothing wrong with that. I believe this is probably outside of the record, but there were attempted discussions about it, and it was eventually completely withdrawn, and I don't think it was that long a time. But in the course of the litigation, the subpoenas to the pastors were completely withdrawn. But there was a relevance. You agree that it was improper to include the word sermon? Legally, I don't believe that it was necessarily improper. If there were instructions that were given as part of the sermon and the sermon not being a religious issue, I don't know that that's the case, but the fact that it was called a sermon or not a sermon, I don't know that that's on its own illegal. I think it was absolutely reprehensible to include, even assuming that it was proper to try to get other information about instructions that were given for collection of the petitions. To throw the word sermon in there is excusable. I think as counsel referenced, the mayor wasn't aware of that at the time that it happened. The lawyers were. I mean, the lawyers were. Whoever drafted it were. Whoever drafted it did know that. Well, Mr. Feldman was on top of it, right? He never claimed that it was someone down the chain of command. No, Your Honor. No, I don't believe so. But the mayor did withdraw those, but there was a relevance. That was the reason for the subpoenas to begin with was because of the underlying jury trial, which the jury did find that a number of the signatures and pages were not valid. So that's the second. That was the other piece of litigation that was happening at the same time. As I understand it, Anna Russell, the city secretary, stopped counting because the number of signatures was so much in excess of the amount needed. Correct me if I'm wrong. I'm just trying to understand the record. Correct. Yes, I think that fact is correct. The problem that the city that came up during the litigation regarding whether the pages were valid had to do with, in part, the way the signatures were validated by the petition collectors at the end of whether they were properly verified by the person collecting the petition. And, again, I believe all this is probably outside of our record, but in the trial there were allegations that some of the petitioners I think that the jury found, as I said, that some of the petitions had non-accidental defects, signatures that some maybe were duplicated. I wasn't involved in the trial, but that was, in fact, one of the jury findings. So Anna Russell did count the signatures, but the problems that the city attorney later raised with it  and these other issues that were developed at the trial. But I think, Judge Smith, you hit on one of the main points that I'd like to touch on today. There's three. There's the standing issue, and I completely disagree with counsel's analysis of the Crest case. I think what the Crest case, in fact, said was that an award of attorney's fees under 42 U.S.C. 1983 is limited to the fees in that cause of action. Just as you said, you cannot go back and recover, as in Fowler and Association for Recharged Citizens of Dallas versus Dallas County, you can't go back and recover fees in a prior proceeding, such as an administrative proceeding or, in this case, this state court litigation. That's not recoverable in a 1983 case, and I think that's exactly what the Crest decision held. There's also the problem in this case with standing that HAP, the pastor's counsel, was not a party below. They, as is admitted, they are the only ones that incurred attorney's fees. The other individuals, neither Mr. Williams, Pastor Williams, or any of the other pastors, incurred attorney's fees, so they certainly don't have standing. Even if attorney's fees were recoverable as a part of this cause of action, they're not. So there's no standing here, at least with respect to the attorney's fees for HAPCD or any of the other individuals. So there's no injury, in fact, that will be redressed by the favorable decision. If this court ruled that way. Now, with respect to the idea of the constitutional violations, there is, there are no, under section, under 1983, there has to be an allegation, factual allegations, to support that there was a deprivation of a constitutional right. And also, I disagree with counsel on this point. A referendum is not, has been found not to be a constitutional right. It is a. No, he said, you're not disagreeing with him. He did say that. He said that there's no, Texas has no statewide initiative or referendum, but that's. It's not a federally, excuse me, then I misunderstood. Not a federally guaranteed right. Now, it is true that when there is a, the courts have held that when the right is given, then there must be, the state cannot impose restrictions on them that are not reasonable. But here, but it's not a fundamental right. And so what's necessary with respect to the restrictions on any kind of a petition is that they be, have a rational relationship reasonably related to the purpose of administering a fair initiative procedure. And here, to the extent that it's relevant, but again, it goes back to why this issue came up about whether the procedures were, why the city did not enforce the referendum initially, was because the procedures in the referendum had certain requirements regarding the signatures. And what was, as I said, what created, what was a valid signature page, how it had to be notarized, et cetera. There's two circuit court cases with very, very similar facts, where a party came in challenging the government's refusal to enforce a referendum because of these kind of lack of verification on signatures. One was the Kendall case from the Fourth Circuit, Kendall v. Balzerzak. And the court found there was no violation of freedom of associate petition or to vote in that case because the restrictions on the referendum petition were content neutral, non-discriminatory, and rational, there was a rational relationship between the restrictions, the requirements for verification and so forth, and the state's need to be sure that the referendum petitions were valid and legitimate petitions. The other case is Taxpayer United v. Austin Sixth Circuit case, the same type of thing. The signatures were disqualified, just like initially happened here due to statutory deficiencies, and the court found that there was not any constitutional violation there because the irregularities and the regulation was non-discriminatory, content neutral, and reasonably related to the purpose of administering the petition. I'd also like to, well, with respect to the other constitutional rights, freedom of religion, I think we've talked about that to the extent that's pled not totally clear. But, again, there was no, there is no absolute right for a religion not to respond to a church or not to respond to a discovery request. So that's, I think, United States v. Holmes case out of this court. There was no burden on religion, even though those, obviously, they were withdrawn, as we talked about, so there was ultimately no harm. But the requests made were reasonably related to the ongoing litigation. They were relevant and in no way burdened or interfered with the religious activities of the individuals. No one's speech was interfered with. Obviously, all of these issues were played out in the state court litigation. There was no denial of a right to vote. The only citizen who had a— You don't think that there was an overall chilling effect where the city attorney of the fourth-largest city in the country issues these blanket and overly broad subpoenas to churches regarding activity that they're engaged in? There was a motion to quash filed by the pastors, by the plaintiff's attorney filed on behalf of the pastors. That and the issue, as I said, never ultimately had to be heard by the court, as I understand, because the parties worked it out and the city withdrew the subpoenas. But the subpoenas were for activity in the past. There was no— Well, but there's the message there that you better not engage in this kind of thing in the future. That's what chilling effect is all about. Well, the chilling effect, would it chill a person of ordinary firmness? I think, you know, cases on the—for example, with the police officers. I think we've got the Keenan v. Tejada case is a good example of what the courts look at in the chilling effect, which is when that case involved a person making a complaint, I think, about a police commissioner and then later was stopped with officers for some sort of traffic violation with six officers coming after him with guns. All right. That was a chilling effect. Here there's certainly no factual allegation to support that any rights for any individual was chilled from pursuing future activities, which, I mean, obviously the facts are to the contrary because they did continue with the litigation and moved to quash the improper subpoenas and the city eventually withdrew them. So there's really no facts alleged at all that would support that there was any chill of a constitutional right with respect to the subpoenas. Finally, I do want to make one other point with the subpoenas, and that has to do with the litigation privilege, which in Texas is an absolute immunity for actions taken during the course of litigation. And this court recognized it in Shanks v. Allied Signal. It is a complete immunity from suit. It's not a defense to liability. So that there's a privilege communication taken in the course of litigation or an action in the course of litigation is not actionable. So with respect to the subpoenas, the former Mayor Parker's actions are protected by that immunity, and there was no basis for a cause of action arising from that. With respect to the referendum allegations in terms of the way that the city reviewed those signatures and after the city secretary looked at them, that was part of the legislative process. That was part of an ordinance that was being challenged, and the whole process of taking that ordinance through the referendum process, that's legislative, and that also falls within an absolute immunity, which is the legislative immunity. So even with all of the other issues, those two immunities protect both of the actions that are alleged here. And again, you know, there's a lot of conclusive statements, and I understand that there's issues that people feel strongly about, but the two acts that are alleged here that were the violation of the rights are with respect to the analysis of the referendums and then those subpoenas, and both of those are protected by immunities. And we, unless the court has questions, we'd ask that you affirm the district court's ruling dismissing this case for standing and for failing to state a claim. Thank you. Back to you, Mr. Taylor. I want to touch a couple of points. First, going back, Judge Smith, to your question about redressability, one of the first things you asked me, it's important to remember that besides Pastor Williams, who was a litigant in the state court cases, the others were not. They didn't file any lawsuits. They weren't involved. The three pastors that received these subpoenas were foisted into the state court proceeding, but it wasn't anything they initiated. They were trying to defend themselves. So when you look at what the trial judge did below in finding number four, she knocked me out on claim preclusion. She said that the 1983 action to recover attorney's fees is barred by claim preclusion. Well, how can you be precluded from asserting a claim in federal court when you were not a party in the state court proceedings? The only argument that that trial court finding would have any merit or relevance to is to Pastor Williams because Pastor Williams was involved. And so I wanted to make it clear on redressability, four of the five appellates here weren't involved below, and when you look at Pastor Williams, he did file mandamus actions. You can't collect fees. I've already said that. He did, alongside that, have to file a state court case in trial court, and that is linked to the defendant's wrongful conduct. That trial court lawsuit should never have been required to have been filed because had the mayor followed the Constitution at the city level, the city charter, and obeyed the ministerial obligations that she and the city council had, then this would have been put on the ballot and we would have never had to file that trial court case. What's your response to counsel Opposite's argument that on the attorney's fees issues, assuming recoverability under 1983, it is only under the case cited in the instant litigation, in other words, within the litigation that's proceeding, not for the litigation that predated that, that may have even been the precursor for this litigation? She says that's what the holdings of that is. So what do you say? Let me give you three cases and I'll quickly answer. The first case is North Carolina, DOT versus Crest Street, U.S. Supreme Court, 1986. What happened there is they said, look, you can't just come into federal court and ask for past fees incurred. You've got to make a 1983 claim and then under 1988 you've got to link the past cost with the defendant's behavior. If you do that, you can collect, and so in North Carolina they said all the time and expense and lawyer fees and court costs on administrative proceedings before the 1983 case was filed are recoverable as long as you make that connection. Here, what I just said is because they wouldn't do their ministerial duty, we had to file a trial court case and spend all that time and money. That was linked to their behavior. Second case, White versus New Hampshire. That's U.S. Supreme Court, 1982. In White versus New Hampshire, they explained the Kerry decision and the court said that an award of attorney's fees for legal work done in state and local prior proceedings is recoverable so long as you link it to 1988. And 1988 says you've got to show that all of these actions you were taking in the past were trying to vindicate the federal rights that they weren't respecting. That's exactly what happened here. They wouldn't put it on the ballot, so all of the litigation, whether it's mandamuses or whether it's the trial court case on the merits, were required upon us to try to vindicate the very right that wasn't upheld by this defendant mayor. Do you take the view that any of your clients are vulnerable on the standing claim or that they're all in here? I mean, recognizing that Williams lived in the city, et cetera, et cetera, and he was involved in all the other litigation, the others weren't, et cetera, so is your parting words that you feel you're fully energized on standing as to each one of the clients who's standing before us? Absolutely, and here's why. The First Amendment court-protected activity is the petition process. You don't have to be living in the city of Houston to engage in the petition process. You can sign as a circulator and not be a registered voter, not live there. You can ask people, hey, do you want to have a vote in Houston on this or not, even though you don't live there? My folks lived in Harris County, but they didn't live in the city, so they couldn't sign the petition, but they organized and they cajoled and they tried to advocate for the petition. That's court-protected speech. Bloom v. Lanier, Glass-Fee Smith, Texas cases, say that that's protected standing. So one question then on what you just said. I understand your red light is on. So the court-protected activity is the right to petition. You stated that. Taking that as a given, there must be limits on the extent to which one could go to federal court to argue about the failure to follow all of the minutiae of a state or local petition ordinance or statute. How would we express that test? What's the threshold? Here's how I'd answer that question, Your Honor. We can go through the World Series. The umpire at the plate is the only person in that building that can call a ball or a strike. Similarly here under the city charter, the only person who could say if this petition was valid or not was the city secretary, Anna Russell, and she said that it was valid. A manager or a player or a fan may not agree, but they don't have the legal right to just say, no, we're not going to do it. And so in this circumstance, when you have a ministerial constitutional obligation to let the people vote and you refuse to do it, that is something that 1983 was designed to prevent and remedy. Okay. That may or may not be, but I don't think you've answered my question. What is the test for the extent to which, in a hypothetical case, the federal courts can intrude and give redress on the failure to follow every single detail of an ordinance or a statute that grants the right to a petition or referendum? Well, I think the Lujan case, Supreme Court case, sets out the three elements you have to demonstrate to have standing under 1983. You've got to prove that there is somebody acting under color of state authority. This mayor, as mayor, stood up and said, we're not going to respect the city secretary's decision. So she was under color of state law when she said that and refused to do what she was required to do. Then you have to demonstrate under Lujan that there's some connection here to harm. I mean, are you really harmed? Is it just hypothetical? This isn't a hypothetical case. Here we had to file the lawsuits to achieve legal victory, to force the mayor to do what she should have done in the first place. So I would answer your question strictly by limiting it to these facts, and that is where you have a non-discretionary state charter constitutional obligation to call a vote and you just say no, then you cannot avoid being reviewed by a federal court under 1983 because our First Amendment rights were implicated and those rights were not respected, and that's what 1983 is for. All right. Thank you, sir. Thank you. Thank you.